UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BOB DEAN, JR.; HOUMA PROPERTY HOLDING CO., LLC; HARVEY PROPERTY HOLDING CO., LLC; PROPERTY HOLDING CO OF CRESCENT CITY, LLC; WEST JEFFERSON PROPERTY HOLDING CO., LLC; MAISON DE'VILLE NURSING HOME, INC; MAISON DE'VILLE NURSING HOME OF HARVEY, INC.; UPTOWN HEALTH CENTER, LLC; ST. ELIZABETH'S CARING, LLC;<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 23-19<br><br><u>JURY TRIAL DEMANDED</u> |

## <u>UNITED STATES' COMPLAINT AND JURY DEMAND</u>

1.      The United States brings this civil action against Bob Dean, Jr. and certain corporate entities he owned and operated to recover double damages under the Double Damages Remedy for Unauthorized Use of Multifamily Housing Project Assets and Income (the "Double Damages Statute") of the National Housing Act of 1934, 12 U.S.C. § 1715z–4a, arising from Dean's financial transactions involving his Federal Housing Administration ("FHA") insured nursing homes before and after Hurricane Ida's tragic landfall in Louisiana in late August 2021.

2.      As the owner and operator of four FHA-insured nursing homes through corporate entities of which he is the owner, principal, and sole member—Houma Property Holding Company, LLC, Harvey Property Holding Company, LLC, Property Holding Company of

Crescent City, LLC, and West Jefferson Property Holding Company, LLC (collectively, the "Ownership Entities"), and Maison De'Ville Nursing Home, Inc., Maison De'Ville Nursing Home of Harvey, LLC, Uptown Health Center, LLC, and St. Elizabeth's Caring, LLC (collectively, the "Operator Entities") (all together, the "Associated Entities")—Dean had a responsibility to ensure the health, safety, and welfare of the residents under his nursing homes' care, per the terms of agreements he signed with the FHA. Because the nursing homes were located in hurricane evacuation zones, those responsibilities included adequately preparing for the danger and damage a hurricane can bring.

3.      But Dean chose to increase his own financial gain at the cost of leaving his nursing homes, and more importantly their residents, unprepared for a potential hurricane. Before 2021, Dean's nursing homes had three different evacuation locations—a nursing home, a medical facility, and an industrial warehouse. After Dean sold the nursing home and medical facility, he left the residents of his nursing homes with no option but to evacuate to the industrial warehouse if a hurricane struck.

4.      Dean owned and operated the warehouse through companies he created and controlled. In the years leading up to Hurricane Ida, Dean required his nursing homes to pay monthly "rent" to one of Dean's corporate entities. But Dean did not use this "rent" to convert the warehouse into an adequate evacuation center and instead used much of the rent to line his own pocket.

5.      When Hurricane Ida made landfall in August 2021, its path took it towards Dean's industrial warehouse evacuation center—a space with a capacity limited to 700 persons but where more than 840 residents from Dean's nursing homes were waiting out the storm.

6.    The situation quickly deteriorated.  Residents languished in squalor and did not receive adequate care, some left naked on their cots, others calling out for help to no avail.  Faced with serious health and safety concerns due to those conditions, along with Dean's refusal to cooperate with staff from the Louisiana Department of Health ("LDH"), LDH began evacuating the nursing home residents from Dean's warehouse on September 1, 2021.

7.    In the days following the hurricane, Dean and his companies ransacked the nursing homes' finances.  Dean borrowed money from his FHA-insured nursing homes to pay the September mortgage payments for the homes.  Although the use of those funds came with the express condition that Dean repay the money by December 31, 2021, he never did.

8.    Even more, after LDH revoked his licenses to operate nursing homes, citing Dean's failed evacuation of the homes during the hurricane, Dean and the Associated Entities emptied out the nursing homes' bank accounts, transferring the income and assets into Dean's personal bank accounts that Dean used to purchase luxury items such as a car, antiques, and firearms, and to pay personal loans and allowances to family members.

9.    By and through this action, the United States seeks to recover the nursing homes' income and assets that Dean and the Associated Entities misused, and to hold Dean and the Associated Entities accountable for misusing the funds intended to care for Dean's nursing home residents for their own financial gain.

**JURISDICTION AND VENUE**

10.    This action arises under the Double Damages Statute, 12 U.S.C. § 1715z-4a.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

11.    This Court has personal jurisdiction over Dean because he owns property and transacts business within the Middle District of Louisiana.

- 3 -

12.     This Court has personal jurisdiction over the Associated Entities because they are headquartered in and transact business within the Middle District of Louisiana.

13.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. §1395, because Dean and the Associated Entities transact business within the Middle District of Louisiana and because a substantial part of the events that gave rise to the claims occurred in the district.

## THE PARTIES

14.     Plaintiff the United States of America, through the Department of Housing and Urban Development ("HUD") and its component FHA, promotes the housing, health, and care of American seniors.  One way it promotes those goals is by providing financing options for nursing home owners by insuring mortgage loans for purchasing, refinancing, constructing, or substantially rehabilitating nursing homes.  The FHA conditions that financing in part on the nursing home owners' and operators' agreement to comply with certain physical safety and quality of care requirements.

15.     Defendant Bob Dean, Jr. is the owner, principal, and sole member of the Associated Entities, and a resident of the state of Georgia.

16.     Defendant Houma Property Holding Company, LLC ("Houma") is the owner of Maison De'Ville Nursing Home - Houma ("Maison De'Ville Houma"), an FHA-insured nursing home (FHA Project Number 064-22036) located at 107 S. Hollywood Rd., Houma, LA 70360.

17.     Maison De'Ville Nursing Home, Inc. ("MDNH") is the operator of Maison De'Ville Houma.

18.     Defendant Harvey Property Holding Company, LLC ("Harvey") is the owner of Maison De'Ville Nursing Home of Harvey ("Maison De'Ville Harvey"), an FHA-insured nursing home (FHA Project Number 064-22057) located at 2233 8th Street, Harvey, LA 70058.

- 4 -

19.     Maison De'Ville Nursing Home of Harvey, LLC ("MDNHH") is the operator of Maison De'Ville Harvey.

20.     Property Holding Company of Crescent City, LLC ("Crescent City") is the owner of Maison Orleans Healthcare of New Orleans ("Maison Orleans"), an FHA-insured nursing home (FHA Project Number 064-22095) located at 1420 General Taylor Street, New Orleans, LA 70115.

21.     Uptown Health Center, LLC ("Uptown") is the operator of Maison Orleans.

22.     West Jefferson Property Holding Company, LLC. ("West Jefferson") is the owner of West Jefferson Health Care Center ("West Jefferson HCC"), an FHA-insured nursing home (FHA Project Number 064-22096) located at 1020 Manhattan Boulevard, Harvey, LA 70058.

23.     St. Elizabeth's Caring, LLC ("St. Elizabeth") is the operator of West Jefferson HCC.

## THE DOUBLE DAMAGES STATUTE

24.     The Double Damages Statute provides a broad remedy to deter anyone from improperly distributing or misallocating funds from an FHA-insured project by giving the government an additional remedy beyond the traditional remedies of foreclosure and breach of contract.

25.     Under the Double Damages Statute, the United States may bring an action against any "person" to recover "any assets or income used by any person in violation of . . . a regulatory agreement [with the FHA] that applies to a . . . nursing home . . . or any applicable regulation." 12 U.S.C. § 1715z–4a (a).  Further, "[f]or purposes of this section, a use of assets or income in violation of the regulatory agreement . . . or any applicable regulation shall include any use for which the documentation in the books and accounts does not establish that the use was made for a reasonable operating expense or necessary repair of the property and has not been maintained in

accordance with the requirements of the Secretary and in reasonable condition for proper audit." *Id.* at 1715z–4a (a)(1).

26.    Liability extends to "any beneficial owner of the property under any business or trust, any officer, director, or partner of an entity owning or controlling the property, any nursing home lessee or operator . . . [and] any other person or entity that controls the property regardless of that person or entity's official relationship to the property." *Id.* § 1715z–4a (a)(2).  The United States is entitled to recover "double the value of the assets and income of the property that the court determines to have been used in violation of the Regulatory Agreement[.]" *Id.* § 1715z–4a (c).

## FACTUAL ALLEGATIONS

### I.    FHA NURSING HOME MORTGAGE INSURANCE PROGRAM

27.    HUD is a cabinet-level agency of the United States.  Its mission is to create strong, sustainable, inclusive communities and quality affordable homes for all.

28.    FHA, which is a part of HUD, is one of the largest mortgage insurers in the world and offers several mortgage insurance programs.  Pursuant to Section 232 of the National Housing Act of 1934 ("NHA"), 12 U.S.C. § 1715w, FHA provides mortgage insurance on loans that cover residential care facilities.  Section 232 loans help finance nursing homes, assisted living facilities, intermediate care facilities, and board and care homes.  FHA mortgage insurance provides lenders with protection against losses that result from borrowers defaulting on their mortgage loans. The lenders bear less risk because FHA will pay a claim to the lender in the event of a borrower's default.

29.    A nursing home insured under Section 232 typically has two corporate entities involved in its financial operations and oversight: an owner that owns the facility and is the

borrower on the underlying mortgage, and an operator retained by the owner to run the day-to-day operations of the nursing home.

30.     To comply with the NHA and its regulations, both owners and operators of healthcare facilities with FHA-insured mortgages must enter into a Healthcare Regulatory Agreement ("Regulatory Agreement") for each FHA-insured property or healthcare facility. These Regulatory Agreements are fundamental and essential components of the federal financing scheme for healthcare facilities under the NHA: HUD agrees to exculpate the owner from personal liability for repayment of the mortgage in return for the owner's agreement to operate the project in accordance with the terms and conditions of the Regulatory Agreement. *See, e.g.,* 12 U.S.C. § 1713(b)(2). As such, the Regulatory Agreement provides the means by which the FHA can regulate the owner and operator and the use of the collateral securing the mortgage loan.

31.     The Regulatory Agreement generally provides that the owner and operator may only use income or assets belonging to the nursing home ("Project Funds") for reasonable operating expenses.

32.     The owner's Regulatory Agreement also prohibits the owner from making distributions to owners except from Surplus Cash and in accordance with the procedures dictated by the Regulatory Agreement. Surplus Cash is defined by the Regulatory Agreement as cash remaining after nursing homes have satisfied their various obligations under the agreements. *See* 12 U.S.C. § 1715(b); 24 C.F.R. §§ 200, 207, and 232.

33.     The Regulatory Agreement provides serious consequences if it is violated. Upon declaring an Event of Default under the agreement, HUD may exercise its authority to, among other things, collect the rents of the property to make any payments required by the Regulatory Agreement, or take possession of the nursing home.

34.    The operator also enters into other agreements that govern certain financial aspects related to operating the nursing homes.  Specifically, the operator, the operator's bank, and the mortgage lender enter into a Deposit Account Control Agreement ("DACA") that, upon proper notice and following certain triggering events, such as default or loss of a nursing home license, permit the lender to exercise exclusive control over the bank accounts the operator uses to operate the nursing home.  Exclusive control gives a lender the right to direct the disposition of all accounts governed by the DACA without any further consent by the operator.

35.    In addition, the operator, the operator's bank, and the mortgage lender enter into a Deposit Account Instructions and Service Agreement ("DAISA") that governs the use of bank accounts into which government receivables, e.g., Medicare and Medicaid funds, are deposited ("Collection Accounts").  The DAISA mandates that all funds deposited into the identified Collection Account must flow to a designated DACA account before the operator may further transfer or use the funds.  The DAISA also prohibits the operator from redirecting the DAISA cashflow away from the designated DACA account without notice to and approval from the lender.

36.    Taken together, the DACA and DAISA ensure that the operator maintains funds received to operate the nursing home in accounts that can be controlled by the mortgage lender in the event of the owner's default, or certain other triggering occurrences.

37.    The nursing home owner must also establish and maintain a Reserve for Replacement account ("R4R") for each nursing home.  The owner may use funds held in the R4R account to make needed repairs to a nursing home or to cover mortgage payments in the event of an emergency.  However, R4R funds may only be used with HUD's written permission and must be repaid pursuant to the terms established by HUD in that written permission.

38. Participants in the FHA nursing home mortgage insurance program must also abide by the relevant HUD regulations discussed in Paragraphs 59 through 63 below.

## II. DEAN AND THE ASSOCIATED ENTITIES AGREED TO CERTAIN RESTRICTIONS IN EXCHANGE FOR PARTICIPATING IN THE FHA NURSING HOME MORTAGE PROGRAM

39. Dean, by and through the Associated Entities, owns and previously operated four FHA-insured nursing homes in Louisiana—Maison De'Ville Houma, Maison De'Ville Harvey, Maison Orleans, and West Jefferson HCC. Dean has owned those nursing homes for a number of years through corporate entities that he established. Over the last 10 years, he secured FHA-insured mortgage loans for each of those nursing homes.

40. Like many borrowers that participate in the Section 232 program, Dean established separate corporate entities to own and operate his nursing homes.

41. In addition, Dean used Louisiana Health Care Consultants, LLC ("LHCC"), a corporate entity that he owned and directed, as a management agent to oversee his nursing home business.

### A. Dean Signed Regulatory Agreements that Restricted His Use of Project Funds as an Owner

42. On June 1, 2013, Dean entered into Regulatory Agreements with HUD relating to the ownership of Maison De'Ville Houma and Maison De'Ville Harvey, respectively (the "Houma and Harvey Regulatory Agreements"). Dean signed these agreements as the principal and sole member of the Houma and Harvey ownership entities, and in consideration of the mortgage insurance provided by HUD related to the nursing homes.

43. The Houma and Harvey Regulatory Agreements require those entities, as owners, to comply with certain terms and conditions including, but not limited to:

a.    Paragraph 9(g) requires that if the owner receives property in violation of the agreements, the owner must hold those funds in trust.  If the owner loses control or possession of the nursing home, the owner must deliver all funds held in trust to the mortgage lender "to the extent that the mortgage indebtedness has not been satisfied."

b.    Paragraph 6(e) prohibits the owner from "mak[ing], or receiv[ing] and retain[ing], any distribution of" the nursing home's assets or income "except surplus cash," except in certain conditions.  Those conditions include that the owner may only make distributions after the relevant fiscal period and that the owner may not make any distribution when there is any default under the agreement or under the underlying mortgage.   "Distribution" means "any withdrawal or taking of cash or any assets of the project . . . excluding payment for reasonable expenses incident to the operation and maintenance of the project."

c.    Paragraph 7 requires the owner to maintain the nursing home "in good repair and condition" and to maintain all licenses "required to operate" the nursing home.

d.    Paragraph 2(a) provides that the owner may only disburse funds from the R4R after obtaining HUD's express consent.

e.    To ensure compliance with the agreements' requirements, and to allow proper oversight, Paragraphs 9(c) requires that the nursing home's "books, contracts, records, documents and other papers" must be "maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time."

44.    Likewise, on September 1, 2017, Dean entered into Regulatory Agreements with HUD relating to the ownership of West Jefferson and Maison Orleans, respectively (the "West

Jefferson and Crescent City Regulatory Agreements"). Dean signed these agreements as the principal and sole member of the West Jefferson and Crescent City ownership entities, and in consideration of the mortgage insurance provided by HUD related to the nursing homes.

45.    The West Jefferson and Crescent City Regulatory Agreements require those entities, as owners, to comply with certain terms and conditions including, but not limited to:

a.    Paragraph 16(b) prohibits the owner from distributing nursing home assets after the lender has given written notice of "a violation or default" under any of the underlying mortgage documents, or if the owner is not providing "necessary services for the operation of" the nursing home "on a regular basis." "Distribution" means "any disbursal, conveyance, loan or transfer of case, any asset of [the owner], or any other portion of the Mortgage Property, other than in payment of Reasonable Operating Expenses." "Reasonable Operating Expenses" are "expenses that arise from the operation, maintenance and routine repair" of the nursing home.

b.    Paragraph 13(f) requires that if the owner borrows funds from the R4R, the owner must repay those funds to the R4R "pursuant to the terms approved by HUD prior to the making of such a loan."

c.    Paragraph 21 dictates that the owner must "not commit or permit Waste" and must keep, or cause to be kept, the nursing home "in decent, safe, sanitary condition and good repair." "Waste" is defined as "a failure to keep the [nursing home] in decent, safe and sanitary condition and in good repair."

d.    To ensure compliance with the agreements' requirements, and allow proper oversight, Paragraph 12 requires that all expenditures in connection with the nursing home "must be fully documented" so as to "provide reasonable assurance

. . . that such expenditures are permitted" under HUD statutes, regulations, and requirements. Undocumented expenses are not "Reasonable Operating Expenses."

**B.     Agreements and HUD Regulations Also Restricted Dean's Use of Project Funds as an Operator**

46.     As the principal and sole member of the nursing homes' operating entities, Dean also signed Regulatory Agreements, Security Agreements, and other control agreements with HUD for each FHA-insured nursing home listed in paragraphs 16-23.

47.     On June 1, 2013, Dean entered into Regulatory Agreements with HUD relating to the operation of Maison De'Ville Houma and Maison De'Ville Harvey, respectively (the "MDNH and MDNHH Regulatory Agreements").

48.     The MDNH and MDNHH Regulatory Agreements require those entities, as operators, to comply with certain terms and conditions including, but not limited to:

a.     Paragraph 3 requires the operator to make payments needed for all mortgage payments, including payments to reserves for taxes and insurance and to R4R, and to take care of necessary maintenance.

b.     To ensure compliance with program requirements, and allow proper oversight, Paragraph 14 requires that the operator maintain books, contracts, records, documents, and other papers "in reasonable condition" for audit, and subject to examination and inspection "at any reasonable time."

49.     Concurrent with signing the MDNH and MDNHH Regulatory Agreements, Dean signed Security Agreements on behalf of MDNH and MDNHH (the "MDNH and MDNHH Security Agreements"). Those agreements set out the terms and conditions of Maison De'Ville Houma's and Maison De'Ville Harvey's DACAs and DAISAs and require MDNH and MDNHH,

as the operators of those nursing homes, to comply with certain terms and conditions including, but not limited to:

a.    Paragraph 1(c) requires that the operator must only use Project Funds to maintain or operate the nursing home, except for dispositions in the ordinary course of business and as permitted by the lease.

b.    Paragraph 1(d) prohibits the operator from removing Project Funds without the prior written consent of the mortgage lender, except for "removals and replacements in the ordinary course of business."

c.    Paragraphs 5 and 6(a) provide that the operator is in default in the event of a "default in payment or performance of any obligations, covenant or liability" of the agreement or the nursing home lease beyond any relevant grace periods.  The agreements further provide that in the event of default, the operator is no longer entitled to "possession" or "use" of the nursing home.

d.    Paragraph 6(c) provides that the operator is in default under the agreement if the operator revokes any of the instructions on transferring project income and assets from one account to another, or if the operator terminates the DACA or the DAISA without the approval of the lender and HUD.

e.    Paragraph 7 provides that, in the event of default, the mortgage lender may declare all money owed to it by the owner immediately due and payable, may require the operator to make the funds available to the lender, and will have all the remedies granted to it under the agreement.

50.    On September 1, 2017, Dean entered into Regulatory Agreements with HUD relating to the operation of West Jefferson and Maison Orleans, respectively (the "St. Elizabeth and Uptown Regulatory Agreements").

51.    The St. Elizabeth and Uptown Regulatory Agreements require those entities, as operators, to comply with certain terms and conditions including, but not limited to:

a.    Paragraph 20(e) requires the operator to obtain goods and services "at costs, amounts, and terms that do not exceed reasonable and necessary levels and those customarily paid" for those goods and services.

b.    Paragraph 20(a) requires that all expenditures in connection with the nursing home be fully documented "so as to provide reasonable assurance . . . that such expenditures are Reasonable Operating Expenses." "Reasonable Operating Expenses" are "expenses that arise from the operation, maintenance and routine repair of the Project."   Undocumented expenses are not "Reasonable Operating Expenses."

c.    Paragraph 20(f) prohibits the operator from distributing funds when the nursing home's financial statements demonstrate "negative working capital" or when the operator fails to timely submit financial statements, except to make payments required under the mortgage documents or Regulatory Agreements or for Reasonable Operating Expenses.

52.    Concurrent with signing the St. Elizabeth and Uptown Regulatory Agreements, Dean also signed Security Agreements on behalf of St. Elizabeth and Uptown (the "St. Elizabeth and Uptown Security Agreements").  Those agreements set out the terms and conditions of West Jefferson's and Maison Orleans' DACAs and DAISAs and require St. Elizabeth and Uptown, as

the operators of those nursing homes, to comply with certain terms and conditions including, but not limited to:

    a.    Paragraph 9(a) provides that, in the event of default, the lender may exercise all rights and remedies afforded to it under the relevant loan documents and requires that the operator apply the balance of any deposit account that secures the loan and all other indebtedness, liabilities, obligations, covenants, debts and amounts the owner and/or operator owe to the mortgage lender.

    b.    Paragraph 8(c) establishes that an event of default occurs when the operator has defaulted on or breached any of the relevant loan documents, including the operator's Regulatory Agreement, as long as the operator has not cured the default or breach, or in the event of "[a]ny change in or revocation of" the account holder instructions in any DAISA, or the DACA or DAISA is modified.

53.    Dean, on behalf of each Operator Entity, signed DACAs establishing the cash flow of the nursing home bank accounts and granting access to and an interest in those accounts to Capital Funding Group ("CFG"), the mortgage lender on the Ownership Entities' FHA-insured Section 232 loans.

54.    The DACAs grant CFG a security interest in each Operator Entity's "right, title and interest in and to the Restricted Accounts and all funds now or hereafter on deposit in or payable to or withdrawable from the Restricted Accounts."  The DACAs also allow CFG to prohibit each Operator Entity's "access to any Restricted Account Funds," at which point the Operator Entity "will no longer be allowed to access the Restricted Account funds, and [the mortgage lender] will have the exclusive right to direct the disposition of all Restricted Account Funds."  "Restricted Accounts" are accounts subject to the terms of a DACA.

55.     Through the DACAs, Dean's Operator Entities agree that "the Restricted Account Funds should be paid and/or delivered to" CFG after it receives the instructions to do so, and irrevocably authorizes Capital One Bank, N.A., the bank holding the accounts governed by the DAISAs and DACAs (the "Project Accounts"), to comply with the instructions, even if the Operator Entity objects to them.

56.     Dean, on behalf of each Operator Entity, also signed DAISAs establishing an account for depositing government receivables and requiring that those funds be swept to a designated DACA account before being used for the maintenance, upkeep, and operation of the nursing homes.

57.     The DAISAs grant CFG a security interest in the Operator Entity's "right, title and interest in and to the Collection Accounts and all sums now or hereafter on deposit in or payable to or withdrawable from the Collection Accounts."  The DAISAs also provide that the Operator Entity is not granted access to the Collection Account or any Account Funds "unless such access is specifically provided in this Agreement or is specifically authorized by Secured Party in writing."

58.     The DAISAs signed by Dean specify that any modification of the agreements, including the sweep instructions, made by the Operator Entities without the signed written consent of all parties to the DAISA is an immediate event of default, and that the Operator Entity must give advanced written notice of any modifications or terminations to CFG.

59.     HUD regulations impose further requirements on how Dean, as a nursing home operator, was required to manage the income, assets, and accounts of his FHA-insured nursing homes.

60.    First, HUD regulations specify that "[a]ll accounts" relating to the operation of the property are "project assets subject to control under the insured mortgage loan's transactional documents."  24 C.F.R. § 232.1005.

61.    Second, if the operator fails to file the required financial statements demonstrating positive working capital, the operator "may not distribute, advance, or otherwise use funds attributable to" to nursing home "for any purpose other than operating" that nursing home.  24 C.F.R. § 232.1013.

62.    Third, goods and services "purchased or acquired in connection with" the nursing home from project assets must be "reasonable and necessary for the operation or maintenance of the project," and the costs of those goods and services incurred by the owner or operator must "not exceed amounts normally paid for such goods or services in the area where the services are rendered or the goods are furnished, except as otherwise permitted or approved by HUD."  24 C.F.R. § 232.1007.

III.    **HURRICANE IDA AND THE DISASTER AT DEAN'S CALHOUN STREET WAREHOUSE**

   A.    **The Evacuation of Dean's Nursing Homes and the Squalid Conditions at the Calhoun Street Warehouse**

63.    On August 26, 2021, Louisiana declared a state of emergency due to the threat of what was then Tropical Storm Ida.  That same day, Dean ordered the evacuation of all his nursing homes.

64.    The next day, as Hurricane Ida bore down on Louisiana, Dean and the Associated Entities began evacuating nursing home residents to an industrial warehouse located in Tangipahoa Parish (the "Calhoun Street Warehouse") that Dean purchased through a shell company in 2015. Even though the warehouse's capacity was limited to 700 persons, Dean and the Associated Entities evacuated more than 840 residents to the warehouse to ride out the storm.

65.    On August 29, 2021, at 11:55 a.m., Hurricane Ida made landfall as a Category 4 Hurricane in Lower Lafourche Parish near Port Fourchon, Louisiana, with maximum sustained wind speeds of 150 miles per hour.

66.    Between August 29 and 30, 2021, Hurricane Ida passed through Tangipahoa Parish with high winds and heavy rain.  The Calhoun Street Warehouse lost power from the local service provider and began using an onsite generator for power.   However, the generator failed intermittently, and staff was not able to provide adequate care to the residents.

67.    On August 30, 2021, LDH employees were finally able to assess the situation at the Calhoun Street Warehouse.  They observed that conditions on the ground had rapidly deteriorated.

68.    LDH inspectors who entered the warehouse observed piles of dirty linens strewn about, strong smells of urine and feces, mud and puddles of water throughout the warehouse, cots and inflatable mattresses lining the concrete floor without sufficient space between them to allow for movement and care of residents, and growing mounds of garbage.

69.    Even more, residents were not being cared for.  Some were left naked or in a t-shirt and diaper on their cots.  Others called out for help, but those calls went unanswered.

70.    The Associated Entities' staff did not prepare sufficient food, provide wound care, or ensure adequate medical care and support for the residents.

71.    Further, sanitation could not be maintained at the Calhoun Street Warehouse because food was to be prepared next to the port-a-lets, i.e., portable toilets.  Even more, the port-a-lets were so far removed from some of the residents that they were forced to use buckets as bathrooms.

72.    While this disaster was unfolding at the Calhoun Street Warehouse, Dean was far from danger and out of Louisiana.  But his staff kept him well informed of the seriousness of the

situation at the evacuation center.  On August 30, 2021, at 6:12 p.m., Dean texted LHCC employee Donise Boscareno, who was overseeing operations at the Calhoun Street Warehouse, asking "How is everything going over there?"

73.    Boscareno responded seven minutes later, "It is not well.  We can not [*sic*] do this. We can not [*sic*] take care of our people.  People are dying.  We need to send them somewhere they can be cared for medically."

74.    Dean responded, "Calm down I gave you the number to FEMA.  What is really happening I will send someone over you're having a breakdown go home."  Boscareno responded by assuring Dean the situation was as dire as she had described: "I am trying to express reality."

75.    But Dean still refused to act.  Fully aware of the situation at the warehouse and that his employees could not care for the residents there, he demanded that LDH staff trying to assess and aid the situation at the Calhoun Street Warehouse get off his property and insisted his staff keep residents at the Calhoun Street Warehouse.  He texted Boscareno, "I do not want any more patients to leave that building . . . .  I do not want anybody transferred to anywhere unless there's a 911 life or death situation, do you understand."

76.    Over Dean's objections, on September 1, 2021, LDH began rescuing the residents and moving them to other nursing homes where their needs could be met.

77.    Dean was more concerned about losing nursing home residents to other nursing homes than about the safety and care his nursing homes could provide at that time.  Dean did not want residents evacuated from the warehouse because they could then be sent "to a nursing home [] if there is another alternative."

78.    Dean was crystal clear that he prioritized the health of his business over the health of his residents.  He wrote to the staff on the ground at the Calhoun Street Warehouse, "I need to

know where the residents are going before they leave there I have to approve it I hope y'all understand those buildings belong to me." Nevertheless, over Dean's objections and obstruction, LDH continued to evacuate the residents from the warehouse.

79.    At bottom, as the tragedy at the Calhoun Street Warehouse unfolded, Dean's buildings, businesses, and bottom line were his top priorities.

**B.    The Repercussions of the Calhoun Street Warehouse Disaster**

80.    LDH completed its evacuation of the Calhoun Street Warehouse on September 2, 2021, placing all of Dean's residents in other nursing homes or hospitals, or with family on a temporary basis. After the evacuation, not a single resident ever returned to one of Dean's nursing homes, and the nursing homes ceased operations.

81.    On September 7, 2021, LDH revoked the licenses of all of Dean's nursing homes for, among other reasons, cruelty and indifference to the welfare of residents.

82.    In response to Dean's loss of licensure, which violated the Regulatory Agreements for each nursing home, CFG exercised Exclusive Control over the Project Accounts on September 7, 2021, via a letter attached to an email sent to Dean and Capital One. By exercising Exclusive Control, CFG had sole legal authority to access, direct, and use the Project Accounts.

83.    On September 13, 2021, via email and a letter sent via Federal Express to Dean, CFG formally declared the Ownership Entities in default under the terms of their mortgage notes secured by the FHA-insured nursing homes, due to the loss of licensure. The declaration of default triggered restrictions on Dean's use and distribution of Project Funds.

84.    On September 29, 2021, via Electronic Certified Mail sent to Dean, HUD issued formal Notices of Violation of Regulatory Agreements to Dean and the Associated Entities, also due to the loss of licensure.

85.     On January 31, 2022, the Office of Inspector General of the Department of Health and Human Services ("HHS-OIG") excluded the Ownership Entities from participating in all federal healthcare programs due to the loss of licensure.

86.     On May 2, 2022, HHS-OIG also excluded Dean from participating in all federal healthcare programs because he had an ownership or controlling interest in and was an officer or managing employee of the Ownership Entities.

87.     On or about June 22, 2022, Dean was arrested and charged with eight counts of Cruelty to Persons with Infirmities (Louisiana Revised Statutes 14:93.3), five counts of Medicaid Fraud (Louisiana Revised Statutes 14:70.1), and two counts of Felony Obstruction of Justice (Louisiana Revised Statutes 14:130.1) by the State of Louisiana.  The charges stemmed from the disaster at the Calhoun Street Warehouse.

## IV.     DEAN AND THE ASSOCIATED ENTITIES' FINANCIAL MISCONDUCT

88.     Dean's financial misdeeds predated Hurricane Ida—contributing to the conditions his residents faced at the Calhoun Street Warehouse—and then continued in the aftermath of the storm.  Before Hurricane Ida, Dean funneled Project Funds maintained in the nursing homes' bank accounts to his personal bank accounts through rental payments to the warehouse.   Following the hurricane, Dean failed to repay R4R funds he borrowed pursuant to the terms approved by HUD, transferred funds to his personal accounts from Project Accounts over which CFG had exercised exclusive control, and distributed Project Funds to his personal accounts after defaulting on the nursing homes' mortgages.

A. **Dean Funneled Project Funds to His Personal Bank Accounts Via Rental Payments to a Related Entity that Operated the Warehouse**

89.    The catastrophe at the Calhoun Street Warehouse following Hurricane Ida was set in motion by Dean's decision to disburse Project Funds to himself rather than to adequately convert the Calhoun Street Warehouse into a safe and functioning hurricane evacuation center.

90.    Prior to acquiring the Calhoun Street Warehouse, Dean and the Associated Entities' hurricane evacuation plans called for evacuating residents to buildings and locations intended to house people—other nursing homes, medical facilities, and hotels owned and operated by Dean.

91.    Evacuation plans that call for evacuations to buildings intended to house people were, and still are, standard and typical for nursing homes in the region.

92.    In 2015, Dean created a corporate entity named DNHG, LLC that he used to acquire the Calhoun Street Warehouse for $918,000 with the intention of using the warehouse as a hurricane evacuation center, even though it was not intended to house people.

93.    After acquiring the warehouse, Dean made the decision to switch the hurricane evacuation site from the other nursing homes, medical facilities, and hotels listed in the Associated Entities' evacuation plans to the warehouse.

94.    He rewrote the evacuation plans for each of his FHA-insured nursing homes and the Associated Entities submitted those plans to LDH in 2021.  Those evacuation plans list the Calhoun Street Warehouse as having only 700 beds available.

95.    The Associated Entities never submitted an application or plans to the State Fire Marshall to change the use of the Calhoun Street Warehouse from an industrial warehouse to a hurricane evacuation center, and were cited for this failure in the State Fire Marshall's Inspection Report dated September 1, 2021.

96.    Nevertheless, Dean and the Associated Entities evacuated more than 840 residents to the Calhoun Street Warehouse in advance of Hurricane Ida.

97.    The little work that Dean and the Associated Entities did to prepare the Calhoun Street Warehouse for housing nursing home residents during a hurricane evacuation over the five years they owned the warehouse before Hurricane Ida consisted only of ripping out metal shelving and building a few showers.

98.    In the years leading up to Hurricane Ida, Dean required his nursing homes to pay monthly "rent" to use the Calhoun Street Warehouse in case of an evacuation. Yet most of this rent money was not used to convert the warehouse into an adequate evacuation center, but instead found its way into Dean's pocket.

99.    In total, during the five years preceding Hurricane Ida, the Operating Entities paid $1,027,675.67 in rent to Plaquemine Plaza Holdings, LLC ("PPH"), the entity owned by Dean that he created to operate the warehouse. Much of that money was simply transferred to Dean's personal bank account. Specifically, between January 1, 2016 and August 2021:

   a.    MDNH transferred $356,400.00 in Project Funds to PPH;

   b.    MDNHH transferred $246,261.62 in Project Funds to PPH;

   c.    Uptown transferred $174,933.12 in Project Funds to PPH; and

   d.    St. Elizabeth transferred $250,080.93 in Project Funds to PPH.

100.    In just the eight months of 2021 preceding Hurricane Ida, the Operating Entities transferred $121,945.97 in Project Funds to PPH—but PPH used only $26,318.14 to pay third-party vendors who typically provide goods and services. The remaining Project Funds, more than $95,000, were simply transferred to Dean's personal account.

101.    For example, in January 2021, PPH collected $18,850 in rent from the Operating Entities for the evacuation center.  On January 29, 2021, every dollar PPH collected in rent that month was transferred to Dean's personal bank account, thereby funneling directly to Dean all Project Funds paid to PPH in January 2021.  Not a penny was spent on expenses that could ostensibly be considered reasonable operating expenses of the nursing homes, namely the upkeep of, or improvements to, the Calhoun Street Warehouse.

102.    In August 2021, the month that Hurricane Ida hit, PPH again collected $18,850 in rent from the Associated Entities.  More than $12,000 of that amount was transferred to Dean's personal bank account.

103.    Dean did not use, or document the use of, any funds from his personal accounts to pay for goods or services—from third party vendors or purchased on his own—used for the maintenance or preparation of the evacuation center.

104.    Moreover, as discussed in paragraphs 128-134, Dean and the Associated Entities have not substantiated through books or records that the funds paid to third party vendors were spent for the operation and maintenance of the nursing homes or the evacuation center.

105.    Even those Project Funds that the Associated Entities paid to third party vendors were not reasonable and necessary expenditures, because any goods and services they procured resulted in an evacuation center that was not prepared for a hurricane.  Thus, those expenditures were insufficient and inadequate, and therefore, not reasonable.

**B.    <u>Dean Failed to Repay Project Funds He Borrowed to Make Mortgage Payments</u>**

106.    Dean's financial misdeeds continued after Hurricane Ida hit.  The same day LDH began rescuing residents from Dean's evacuation center, Dean asked CFG for money "to assist us on this massive evacuation [that] could take at least a month."

107.    CFG asked HUD if Dean could use funds from the nursing homes' R4R accounts to make the September mortgage payments.  HUD agreed, writing "Yes, they can borrow from the Reserves for the September payment for the nursing homes and must pay it back to the reserves prior to 12/31/2021."

108.    CFG communicated these repayment terms to Dean, who agreed to them.

109.    In total, Dean's Ownership Entities borrowed $226,805.62 from their R4R accounts on September 2, 2021, on the condition that the money be repaid by December 31, 2021. Specifically, Houma borrowed $69,783.50, Harvey borrowed $35,158.83, Crescent City borrowed $78,101.52, and West Jefferson borrowed $43,761.77.  To date, none of this money has been repaid.

110.    HUD formalized the demand for repayment on July 6, 2022, via letter and email to Dean and each Ownership Entity, demanding repayment in full and establishing the basis for their repayment demand.  To date, Dean and the Ownership Entities have not responded to the demand.

### C.    Dean and Certain Associated Entities Emptied Bank Accounts After CFG Exercised Exclusive Control Over Those Accounts

111.    As discussed above, LDH completed its evacuation of all residents stranded at the Calhoun Street Warehouse by September 2, 2021.  At that point, Dean's nursing homes effectively ceased to operate.

112.    Prior to Hurricane Ida, Dean had been negotiating the sale of his nursing homes and was poised to make almost $70 million from the sale.

113.    But the hurricane and the ensuing repercussions of the evacuation to the Calhoun Street Warehouse put an end to that plan.  Dean was irate when he learned that the sale of his nursing home and his massive payday had fallen through.

114.    Dean instructed his bookkeeper every day—yelling and screaming—that his nursing homes' money needed to be moved.

115.    As discussed above in paragraphs 80-87, LDH's revocation of the licenses to operate Dean's FHA-insured nursing homes caused CFG to deem Dean and the Associated Entities in default on their FHA-insured loans.  In addition, on September 7, 2021, CFG exercised exclusive control over the nursing homes' bank accounts at Capital One pursuant to the DACAs and DAISAs executed by Dean on behalf of the Ownership Entities, CFG, and Capital One.  That same day, CFG sent Dean and Capital One Notices of Exclusive Control via email and Federal Express.   The notices stated that CFG was terminating Dean's and the Associated Entities' access to use or spend funds in the nursing homes' Operating Accounts, and that the Project Funds now belonged exclusively to CFG.

116.    But Dean learned that Capital One had accidently failed to terminate Dean's access to some of the Operating Accounts.  Dean also learned that Capital One had accidentally failed to terminate Dean's access to other project accounts at Capital One that Dean used as shadow operating accounts without the permission of CFG or HUD, and in violation of the DAISAs.

117.    After receiving notification that certain accounts were (or should have been) frozen, Dean repeatedly told his bookkeeper to quickly move the money still in the accounts in case Capital One froze those accounts as well.

118.    Dean's bookkeeper reiterated to Dean via text message on September 10, 2021, that the accounts should have been frozen "because of the stipulations of the loan documents regarding the license status."

119.    But Dean was undeterred.  Knowing full well he was prohibited from accessing funds from the Restricted Accounts, Dean responded and instructed his bookkeeper via text message to "get that money out of there immediately sweep the account."

120.    He continued to press his bookkeeper, directing her via text message to "sweep all the accounts that I have including the escrow account for a nursing home, the insurance account, the workman's comp account everything . . . this is a crucial time, sweep all the accounts."

121.    Ultimately, at Dean's oral and written direction, over the course of six funds transfers, Dean's bookkeeper initiated improper transfers of more than $877,000 in Project Funds from accounts governed by the DACAs, DAISAs, and Security Agreements to one of Dean's personal bank accounts.  These transfers often involved moving money from a nursing home's Collection Account directly to Dean's personal account, thereby bypassing the Restricted Accounts over which CFG had exercised exclusive control.  Specifically, at Dean's oral and written direction, his bookkeeper transferred:

a.    $330,359.50 out of the Maison De'Ville Harvey Collection Account and into one of Dean's personal accounts on September 10, 2021.

b.    $365,373.88 out of the Maison De'Ville Houma Collection Account and into one of Dean's personal accounts on September 10, 2021.

c.    $18,982.00 out of the Maison De'Ville Houma Collection Account and into one of Dean's personal accounts on September 14, 2021.

d.    $20,727.00 out of the St. Elizabeth Collection Account and into one of Dean's personal accounts on September 15, 2021.

e.    $14,349.00 out of the Maison De'Ville Harvey Collection Account and into one of Dean's personal accounts on September 15, 2021.

      f.      $127,212.00 out of the St. Elizabeth Collection Account and into one of Dean's personal accounts on September 20, 2021.

122.    At bottom, Dean's instructions were clear.  He instructed his bookkeeper to "just get the money from the frozen accounts into [Dean's] personal account"—and she did.

**D.**    **Dean and the Associated Entities Transferred Other Project Funds to Dean's Personal Accounts After Default**

123.    Dean handled the bank accounts for his businesses like they were his personal checking accounts.  After Dean's nursing homes ceased operating and lost their licenses, and after Dean defaulted on his mortgage loans, this was magnified.  Stung by losing his businesses, Dean simply decided to drain his business accounts and transfer the money into his personal accounts.

124.    In addition to sweeping funds from the Project Accounts governed by DAISAs, DACAs, and Security Agreements, *see* Paragraphs 111-122 above, Dean transferred funds into his personal accounts from other nursing home bank accounts to which he still had access, such as payroll accounts.  Those accounts were not covered by a DACA, but were covered by the terms and restrictions set forth in the Associated Entities' Regulatory Agreements.  As a result, CFG could not, and did not, exercise exclusive control over those accounts.

125.    In total, in the three months following Hurricane Ida, Dean directed the transfer of millions of dollars of Project Funds from other nursing home bank accounts to his personal bank accounts through at least 20 separate checks and/or money transfers.  Dean and the Associated Entities made these transfers in violation of their Regulatory Agreements and the controlling regulations identified in paragraphs 39-62.  Examples of these checks and money transfers include:

      a.      A $15,000 check made out to Dean from a West Jefferson HCC bank account on September 8, 2021;

b.    A $769,710.25 check made out to Bob Dean Enterprises, a company Dean established to purchase antiques and vehicles for his personal use, from a Maison Orleans bank account on September 13, 2021;

c.    A $20,000 transfer from a Maison De'Ville Harvey bank account to Bob Dean Enterprises on September 16, 2021;

d.    A $116,478.85 transfer from a Maison De'Ville Houma bank account to Bob Dean Enterprises on October 29, 2021; and

e.    A $225,000.00 transfer from a Maison Orleans bank account to Bob Dean Enterprises on November 9, 2021.

126.    The funds that Dean and the Associated Entities transferred from other Project Accounts to Dean's personal accounts did not simply sit in his bank accounts. Instead, Dean used project assets and income to fund his lavish lifestyle. For example:

a.    On September 24, 2021, following numerous transfers of Project Funds into the Bob Dean Enterprises account, Dean spent more than $1.75 million at Rock Island Auction Company, a company that advertises itself as "the world's top auction house for antique and collector firearms."

b.    In October 2021, Dean used the Bob Dean Enterprise account to purchase a luxury car, paying close to $100,000 to a Ford dealership in Georgia.

c.    In October 2021, Dean routinely used the Bob Dean Enterprise account to make payments for personal expenses, such as his personal cell phone bill and cable bill, to pay down personal loans and personal credit cards, and to issue allowances and cash gifts to his wife and stepchildren.

127.    While pilfering Project Funds to buy guns, antiques, and a car, and to pay personal loans and family allowances, Dean did not pay bills associated with his nursing homes after Hurricane Ida.

### E.    Dean and the Associated Entities Did Not Keep Books or Records and Failed to Respond to Subpoenas and Document Requests

128.    Per HUD requirements, the Associated Entities were required to file audited financial statements with HUD on or before March 31, 2022.

129.    As noted above, the Associated Entities' Regulatory Agreements prohibited the distribution of Surplus Cash unless the required financial accounting has been performed, and Surplus Cash has been identified.  Nevertheless, the Associated Entities did not submit the required audited financial statements to HUD as required by March 31, 2022.  To this date, they still have not made those submissions.

130.    Instead of following HUD's rules to identify and distribute Surplus Cash, if Dean's nursing home accounts had money remaining at the end of the month, Dean would simply transfer the funds to his personal bank account for his distribution.

131.    Further, after Hurricane Ida, Dean and the Associated Entities no longer kept or maintained books and records of financial transactions.

132.    Dean and the Associated Entities have also failed to produce documents in response to subpoenas and document requests.

133.    During the investigation preceding this Complaint, the HUD Office of Inspector General served administrative subpoenas on the Associated Entities, seeking documents concerning the use of project assets and income to convert the Calhoun Street Warehouse from an industrial warehouse to a hurricane evacuation center, and any uses of project assets and income

after August 2021.  Service was perfected on all the Associated Entities in May 2022; the subpoenas identified a document return date of June 3, 2022.

134.    The Associated Entities did not produce any documents in response to those subpoenas—or otherwise respond to the subpoenas—on or before June 3, 2022.  To date, they still have not.

## V.    DEAN AND THE ASSOCIATED ENTITIES VIOLATED THE REGULATORY AGREEMENTS AND FEDERAL LAW

135.    The financial misconduct alleged above subjects Dean and the Associated Entities to penalties and repayment obligations under the Double Damages Statute.

### A.    Dean and the Associated Entities Are Persons Under the Double Damages Statute

136.    The Ownership Entities are beneficial owners of the FHA-insured nursing homes, as set forth above.

137.    The Operator Entities are nursing home operators of the FHA-insured nursing homes, as set forth above.

138.    Dean is an officer—the only officer—of the entities owning FHA-insured nursing homes, and an individual who controlled FHA-insured nursing homes.

### B.    Dean and the Associated Entities Used Project Assets and Income in Violation of Regulatory Agreements and Applicable Regulations

139.    As set forth in paragraphs 111-127, Dean and the Operator Entities distributed the nursing homes' assets and income to PPH and ultimately to Dean that were not from Surplus Cash. Moreover, even those Project Funds that were paid to third party vendors were not reasonable and necessary expenditures, as the goods and services they procured were insufficient and inadequate, and therefore, not reasonable.

140.    As set forth in paragraphs 106-110, Dean and the Ownership Entities borrowed Project Funds from the R4R accounts on September 2, 2021, pursuant to an agreement to repay those funds by December 31, 2021.  However, Dean and the Ownership Entities never repaid those Project Funds.

141.    As set forth in paragraphs 111-122, Dean and Houma, Harvey, West Jefferson, MDNH, MDNHH, and St. Elizabeth, via improper fund transfers, circumvented the agreed-upon sweep instructions on the Collection Accounts and Restricted Accounts after CFG had exercised exclusive control over the Restricted Accounts, and instead transferred those funds into Dean's personal accounts.

142.    As set forth in paragraphs 123-127, Dean and the Associated Entities used project assets and income to fund transfers from the nursing homes' bank accounts to Dean's personal accounts.

C.    **Dean and the Associated Entities Did Not Maintain Books and Accounts to Establish that Project Assets and Income Were Used for Reasonable Operating Expenses or Necessary Repairs**

143.    As set forth in paragraphs 128-134, Dean and the Associated Entities failed to maintain and produce any books and accounts.  Because Dean and the Associated Entities failed to maintain such books and accounts, they cannot establish that the use of project assets and income identified herein were for reasonable operating expenses or necessary repairs.

144.    Dean and the Associated Entities have not produced documentation in the books and accounts of the Associated Entities, and such documentation does not exist for the use of the nursing homes' assets or income following Hurricane Ida.  Because such documentation does not exist, Dean and the Associated Entities cannot establish that the use of project assets and income identified herein were used for reasonable operating expenses and necessary repairs.

## COUNT I
### VIOLATION OF DOUBLE DAMAGES STATUTE, 12 U.S.C. § 1715Z-4A, AGAINST DEAN AND THE OPERATOR ENTITIES FOR <u>PAYMENTS TO PLAQUEMINE PLAZA HOLDINGS</u>

145.    The United States repeats and re-alleges the allegations contained in Paragraphs 1-144 above, as if fully set forth herein.

146.    The Operator Entities operated, and Dean controlled, a nursing home with a mortgage insured by HUD under the NHA.

147.    Dean, on behalf of the Operator Entities, executed Regulatory Agreements pursuant to HUD's authority to regulate nursing homes with FHA insurance, and agreed to abide by regulations promulgated by HUD and applicable to FHA-insured nursing home operators.

148.    As set forth above, Dean and the Operator Entities used assets and income in violation of the Regulatory Agreements and applicable regulations when they paid Project Funds to PPH for goods and services that were not reasonable or necessary.

149.    Based upon Dean and the Operator Entities' use of project assets in violation of the Regulatory Agreements and applicable regulations, the United States is entitled to relief under 12 U.S.C. § 1715z-4a.

## COUNT II
### VIOLATION OF DOUBLE DAMAGES STATUTE, 12 U.S.C. § 1715Z-4A, AGAINST DEAN AND THE OWNERSHIP ENTITIES FOR <u>FAILURE TO REPAY BORROWED R4R FUNDS</u>

150.    The United States repeats and re-alleges the allegations contained in Paragraphs 1-144 above, as if fully set forth herein.

151.    The Ownership Entities owned, and Dean controlled, a nursing home with a mortgage insured by HUD under the NHA.

152.    Dean, on behalf of the Ownership Entities, executed Regulatory Agreements pursuant to HUD's authority to regulate nursing homes with FHA insurance.

153.    As set forth above, Dean and the Ownership Entities used assets and income in violation of the Regulatory Agreements when they borrowed Project Funds and failed to repay the borrowed funds according to the agreed upon terms.

154.    Based upon Dean and the Ownership Entities' use of project assets in violation of the Regulatory Agreements, the United States is entitled to relief under 12 U.S.C. § 1715z-4a.

**COUNT III**
**VIOLATION OF DOUBLE DAMAGES STATUTE, 12 U.S.C. § 1715Z-4A,**
**AGAINST DEAN, HOUMA, HARVEY, WEST JEFFERSON, MDNH, MDNHH,**
**AND ST. ELIZABETH FOR SWEEP OF ACCOUNTS**

155.    The United States repeats and re-alleges the allegations contained in Paragraphs 1-144 above, as if fully set forth herein.

156.    Houma, Harvey, West Jefferson, MDNH, MDNHH, and St. Elizabeth owned or operated, and Dean controlled, a nursing home with a mortgage insured by HUD under the NHA.

157.    Dean, on behalf of the Associated Entities, executed Regulatory Agreements pursuant to HUD's authority to regulate nursing homes with FHA insurance.

158.    As set forth above, Dean and Houma, Harvey, West Jefferson, MDNH, MDNHH, and St. Elizabeth used assets and income in violation of the Regulatory Agreements and applicable regulations when they swept project assets into Dean's personal account after CFG had exercised exclusive control of the nursing homes' operating accounts.  These transfers were not from Surplus Cash and were not reasonable or necessary.

159.    Based upon Dean, Houma, Harvey, West Jefferson, MDNH, MDNHH, and St. Elizabeth's use of project assets in violation of the Regulatory Agreements, the United States is entitled to relief under 12 U.S.C. § 1715z-4a.

## COUNT IV
## VIOLATION OF DOUBLE DAMAGES STATUTE, 12 U.S.C. § 1715Z-4A,
## AGAINST ALL NAMED DEFENDANTS FOR POST DEFAULT TRANSFERS

160.    The United States repeats and re-alleges the allegations contained in Paragraphs 1-144 above, as if fully set forth herein.

161.    The Associated Entities owned or operated, and Dean controlled, a nursing home with a mortgage insured by HUD under the NHA.

162.    Dean, on behalf of the Associated Entities, executed Regulatory Agreements pursuant to HUD's authority to regulate nursing homes with FHA insurance.

163.    As set forth above, Dean and the Associated Entities used assets and income in violation of the Regulatory Agreements when they transferred after default project assets into Dean's personal account.  These transfers were not from Surplus Cash and were not reasonable or necessary.

164.    Based upon Dean and the Associated Entities' use of project assets in violation of the Regulatory Agreements, the United States is entitled to relief under 12 U.S.C. § 1715z-4a.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America prays for judgment against the Defendants as follows:

A.    As to Counts I, II, III and IV under the Double Damages Statute, double the amount of all funds spent in violation of the Regulatory Agreements, plus all costs relating to the action; and

B.    Such other relief as the Court deems just and proper.

THE UNITED STATES DEMANDS A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE.

UNITED STATES OF AMERICA, by

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

RONALD C. GATHE, JR.
UNITED STATES ATTORNEY

/s/ Davis Rhorer Jr.
Davis Rhorer Jr., LBN 37519
Assistant United States Attorney
777 Florida Street, Suite 208
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443
Fax: (225) 389-0685
E-mail: davis.rhorer@usdoj.gov

JAMIE ANN YAVELBERG
ALISON B. ROUSSEAU
CHRISTOPHER R. B. REIMER
Attorneys, Commercial Litigation Branch
P.O. Box 261, Ben Franklin Station
Washington, DC 20044
(202) 305-3829

*Attorneys for the United States of America*